UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

Jonathan LAYMAN                                                           PLAINTIFF

v.                                                          CIVIL ACTION NO. 3:17-CV-738-CRS

UNITED PARCEL SERVICE, INC.                                                DEFENDANT

# MEMORANDUM OPINION

## I.  Introduction

This case is before the Court on a number of interrelated motions and objections. First, Plaintiff moved to compel a large amount of discovery. The magistrate denied that motion, finding Plaintiff had not demonstrated good cause for modifying the Court's scheduling order—a conclusion to which Plaintiff objects. Around the same time, Defendant moved for summary judgment. Plaintiff filed three separate motions for an extension of time to respond to that motion. Ultimately, finding lack of good cause, the Court will overrule the objections to the magistrate's order and deny the various motions for an extension of time.[1] Addressing the motion for summary judgment as unopposed, but undertaking a thorough examination of the record, the Court will grant the motion.

## II.  Factual and Procedural Background[2]

Plaintiff Jonathan Layman joined Defendant United Parcel Service, Inc. ("UPS") as a Plant Engineering Specialist in Louisville, Kentucky in April of 2014. DN 28-2 at 39.[3] At that

---

[1] After Layman filed his untimely response (DN 38), UPS moved for an extension of time to file a reply (DN 39) and eventually filed their reply (DN 40). Since the Court denies Layman's motion for an extension of time to file a response, it will also deny UPS's motion for an extension of time to file a reply as moot.

[2] Because this case is before the Court on UPS's motion for summary judgment, the Court views the evidence in the light most favorable to Layman. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[3] For the sake of consistency, when citing to the Transcript of the Unemployment Hearing conducted with Judge Bowling, the Court utilizes the internal numbering of the document, as opposed to the page number assigned to the excerpted pages. When referencing all other exhibits, the Court utilizes the page number assigned to the excerpts.

1

time, Layman was provided copies of, and training regarding, UPS's Code of Business Conduct, Policy Book, and Equal Employment Opportunity policies. DN 28-3 at 3. The policies included information about UPS's Business Compliance & Ethics Questionnaire ("Questionnaire"). DN 28-2 at 13. The Questionnaire is designed to ensure awareness of UPS's business ethics and compliance policy and seeks disclosure of known or suspected policy violations. *Id.* at 21. UPS requires all full-time managers, supervisors, and professional specialists worldwide to complete the Questionnaire, typically in the middle of the year. *Id.* at 13. The requirement to complete the Questionnaire was described during new employee orientation and posted on UPS's intranet, with emails sent as reminders. DN 28-3 at 3.

Since Layman was hired partway into 2014, he was not required to complete the 2014 Questionnaire. DN 28-2 at 40. Layman completed his first Questionnaire in September 2015. *Id*. In it, he disclosed some concern that private information about him had been distributed at work with subsequent retaliation for registering those complaints. *Id.* Contemporaneously, he submitted a written statement to UPS's Human Resources Supervisor Vickie Stepp. *Id.* at 40–41. In that letter, Layman alleges that "a previous employer . . . hired a private investigator to try and find evidence of some sort of corporate wrongdoing." DN 28-4 at 3. Layman alleges that the private investigator discovered private information about Layman's "sexual preferences, past sexual relationships, health issues, and personal conversations." *Id.* That information, he alleges, then "found its way" to his coworkers at UPS. *Id.* Upon learning of the sharing of his private information, Layman says he went home and cried, a recording of which was played over the speakers at Layman's workplace. DN 1-1 at 1.

Layman then filed complaints with state and federal cybercrime units. DN 28-4 at 4. It is unclear from the record at this stage what resulted from those complaints. Afterward, Layman

claims he overheard his manager discussing the details of his cybercrime claims with his coworkers, even though Layman had not publicly shared that information. *Id*. He claims he then noticed changes in the way he was treated at work. Specifically, he alleges that some coworkers became rude or hostile and were making comments about private information. *Id.* He also claims that rat droppings were collected and placed onto his desk. DN 1-1 at 1.

After receiving Layman's letter alleging harassment, Stepp interviewed other employees and UPS Corporate Compliance & Ethics Manager Cindy Wren contacted Layman to ask follow-up questions. DN 28-2 at 48–49; DN 28-4 at 2. Layman's concerns could not be substantiated and no further action was taken. DN 28-4 at 2. In response, Layman filed a Charge of Discrimination against UPS with the Equal Employment Opportunity Commission ("EEOC") on April 25, 2016, alleging that he was being harassed because of his gender/sexual orientation and disability. DN 28-5 at 1. The EEOC summarily dismissed that Charge on May 24, 2016. *Id.* at 4.

On or about June 13, 2016, eligible employees (including Layman) were directed to complete the 2016 Questionnaire. DN 28-2 at 67. Layman knew he was required to take the Questionnaire but did not do so. *Id.* at 52. He received email reminders regarding the Questionnaire requirement on July 6, August 1, August 17, August 24, September 6, September 14, September 19, September 21, October 3, October 4, and October 11, 2016, as well as on January 6, 2017. DN 28-6 at 16–27. By the October 11, 2016 email, Layman was the only employee out of 46,808 eligible employees worldwide who had not taken the Questionnaire. *Id.* at 27. Layman also received a phone call from Wren on October 12, 2016, warning him that termination of his employment was possible. *Id.* at 48–49. On November 4, 2016, Area Human Resources Manager Pamala Cecil Pullen met with Layman in person to encourage him to

complete the Questionnaire. DN 28-5 at 2. Layman declined to comply or discuss the Questionnaire, citing his dissatisfaction regarding the handling of his first EEOC Charge. *Id.*

On January 6, 2017, Layman met with Human Resources Operations Manager Sharnika Glenn, who told Layman he had to complete the Questionnaire by that afternoon. DN 28-2 at 22–23. Layman refused. *Id.* at 27. Glenn requested—and Layman provided—a written refusal signed by Layman and witnessed by Glenn and two other employees. DN 28-3 at 38. Layman was then offered one final opportunity to take the Questionnaire. DN 28-2 at 27. When he again declined, Glenn terminated his employment for insubordination. *Id.* After his discharge, Layman filed another EEOC Charge alleging retaliation. The EEOC summarily dismissed that Charge on September 12, 2017. DN 28-3 at 40. Layman then filed this action on December 8, 2017. DN 1-1 at 1.

**III.     Discussion**

As a logical matter, the Court must first address whether to sustain the objection to the magistrate's order and whether to permit an extension of time before addressing the motion for summary judgment. Ultimately, the Court denies both and considers the motion for summary judgment, granting it.

   **A.     Layman's Objection to the Magistrate's Order**

Following objection to a nondispositive order of a magistrate, the Court may "modify or set aside any part of the order that is clearly erroneous or is contrary to law." FED. R. CIV. P. 72(a). *See also* 28 U.S.C. § 636(b)(1)(A). To the extent that no objection is filed, the arguments are waived. *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 147–48 (1985). Layman objects to the magistrate's order for three reasons: (1) the magistrate did not

consider when the issue arose when determining timeliness; (2) the magistrate failed to consider good cause when determining timeliness; and (3) the magistrate relied on a mootness argument.

"We live in a world of deadlines. . . . A good judge sets deadlines, and the judge has a right to assume that deadlines will be honored." *Dunning v. War Mem'l Hosp.*, 534 F. App'x 326, 332 (6th Cir. 2013) (citation omitted). However, with regard to those deadlines "the court may, for good cause, extend the time with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires." FED. R. CIV. P. 6(b)(1)(A). The primary measure of the "good cause" standard is the moving party's diligence in attempting to meet the deadlines, though courts may also consider prejudice to the nonmoving party. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002). Merely proceeding pro se is insufficient, standing alone, to provide good cause. *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991). Good cause is particularly lacking where there has been "a clear pattern of delay." *Id.*

While the magistrate did not specifically reference "good cause" in her order, it is clear to the Court she considered it. In the discovery context, "[a] district court may properly deny a motion to compel discovery where the motion to compel was filed after the close of discovery." *Pittman v. Experian Info. Sys.*, 901 F.3d 619, 642 (6th Cir. 2018) (citation omitted). *See also Morris v. Zurich Am. Ins. Co.*, No. 5:16-CV-129-TBR-LLK, 2018 WL 1875295, at *2 (W.D. Ky. April 19, 2018) ("Motions to compel filed after the discovery deadline are almost always deemed untimely.") (collecting cases).

Certainly, a motion to compel filed after the close of discovery could be proper when a party subject to discovery requests fails to provide information until the end of the discovery period and the motion to compel is filed in a timely manner afterward. However, that scenario is not presented in this case. Here, discovery closed on December 3, 2018. The motion to compel

5

was not filed until January 28, 2019—almost two months later. Such a lapse is sufficiently late to be denied as untimely. *See Craig-Wood v. Time Warner N.Y. Cable LLC*, 549 F. App'x 505, 508 (6th Cir. 2014) (affirming district court conclusion that a motion to compel filed two months after close of discovery was untimely); *Morris*, 2018 WL 1875295, at *2 (motion to compel filed two months after close of all discovery was untimely).

As for the final argument regarding mootness, the magistrate makes no reference to this argument in her order and does not appear to rely on it. Regardless, since she was justified in denying the motion on other grounds, even assuming error *arguendo*, the error would be harmless. As a result, the Court cannot say that the magistrate's decision was clearly erroneous or contrary to law and the objections will be overruled.

B.      **Layman's Motion for Extension of Time to File a Response**

As referenced above, the primary measure of the "good cause" standard is the moving party's diligence in attempting to meet the deadlines, though courts may also consider prejudice to the nonmoving party. *Inge*, 281 F.3d at 625. Of course, courts have a clear preference for adjudication on the merits. *Id.* For that reason, the Federal Rules of Civil Procedure "encourage proper presentation of the record" and advise courts to "take extra care with pro se litigants." FED. R. CIV. P. 56(e)(4) advisory committee's note to 2010 amendment.

Layman represents that he has diligently attempted to complete his response on time but has come across repeated obstacles involving case filings and subsequent legal research. By this point, Layman has sought three separate extension of time. *See* DNs 33, 34, 36. His proposed orders would extend his time to respond from March 15, 2019 to April 8, 2019—more than doubling the ordinary time to respond under the Local Rules. *See* Joint Ky. Civ. Prac. R. 7.1(c) (providing 21 days for filing of responses). The Court sees nothing in the record to demonstrate

6

sufficient diligence from Layman. His only arguments for good cause revolve around his pro se status, which is insufficient. *Jourdan*, 951 F.2d at 110. Further, it is clear that consistently continuing in this pattern of delay causes prejudice to UPS, which seeks to resolve these claims efficiently. Therefore, the various motions for extension of time to file a response will be denied.

### C. UPS's Motion for Summary Judgment

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* In undertaking this analysis, the Court must view the evidence in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378. "[B]efore granting summary judgment against a pro se litigant," "the court may seek to reassure itself by some examination of the record." FED. R. CIV. P. 56(e)(4) advisory committee's note to 2010 amendment.

The party moving for summary judgment bears the burden of establishing the nonexistence of any issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). They can meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." FED. R. CIV. P. 56(c)(1). This burden can also be met by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

7

The complaint alleges ten causes of action: discrimination and harassment in violation of the Americans with Disabilities Act ("ADA"); retaliation in violation of the ADA; discrimination and harassment in violation of Title VII; retaliation in violation of Title VII; negligent hiring, retention, and supervision; intrusion upon seclusion; public disclosure of private facts; false light; conspiracy; and intentional infliction of emotional distress. DN 1-1 at 3–6. As an initial matter, UPS argues that many of Layman's claims are time-barred. Regardless, it argues that the claims fail as a matter of law.

### i. ADA and Retaliation Claims are Partially Time-Barred

To recover in an employment discrimination lawsuit filed under Title VII or the ADA, a claimant must file a timely charge of discrimination with the EEOC. 42 U.S.C. § 2000e–5(e)(1) (Title VII); 42 U.S.C. § 12117 (ADA). If the EEOC dismisses the charge, it must notify the claimant of the dismissal and of the right to bring a civil action, and the claimant must do so within ninety days after receiving a right-to-sue letter. 42 U.S.C. §§ 2000e–5(f)(1), 12117(a); 29 C.F.R. §§ 1601.18(b), 1601.28(b)(3).[4] While the ninety-day requirement is not jurisdictional (and therefore can be subjected to waiver, estoppel, and equitable tolling), it should still be "strictly enforced." *Graham-Humphreys*, 209 F.3d at 557–60. *See also Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (per curiam) ("[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants."); *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) ("experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."). The issuance of a

---

[4] The Sixth Circuit has held that notice is presumed given by the EEOC five days after the right-to-sue letter is sent. *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000). This presumption is rebuttable. *Id.*

subsequent right-to-sue letter does not extend the time limit for subjects contained in earlier letters. *Adams v. Tenn. Dep't of Fin. and Admin.*, 179 F. App'x 266, 271 (6th Cir. 2006).

Here, two EEOC charges were filed. The first alleged discrimination on the basis of gender/sexual orientation and disability under Title VII and the ADA. DN 28-5 at 3. The EEOC dismissed the charge and mailed the dismissal and notice of right-to-sue on May 24, 2016. *Id.* at 4. The second alleged some unspecified retaliation. DN 28-3 at 39.[5] The EEOC dismissed the charge and mailed the dismissal and notice of right-to-sue on September 12, 2017. *Id*. at 40. This lawsuit was filed December 8, 2017—a year past when a Layman was required to file suit based on the first right-to-sue letter. Therefore, the claims made in the original EEOC letter are time-barred. Claims arising from the second right-to-sue letter (retaliation based on termination of employment) would not be barred.

Out of an abundance of caution and to ensure fairness to pro se litigants like Layman, the Court considers whether equitable tolling would be appropriate in this scenario. Factors to consider while examining equitable tolling include "1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness is remaining ignorant of the particular legal requirement." *Truitt v. Cty. of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998). It is clear that Layman had notice of the filing requirement of the first right-to-sue letter. *See* DN 28-5 at 4 (first right-to-sue letter stating "Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.") (emphasis in original). This letter was clearly received by Layman, since it was filed with his complaint. *See* DN 1-2 at 1. As the Court has already discussed, Layman has been less than diligent in pursuing

---

[5] UPS did not receive a copy of the charge, only the EEOC's notice to UPS, informing them that the subject matter was generally "retaliation" and that UPS did not need to take any action. See DN 28-3 at 39.

this lawsuit. His conduct borders on dilatory and has caused this litigation to be extended to the detriment of UPS. On balance, the Court does not believe equitable tolling would be appropriate. Therefore, with the exception of retaliation claims related to his termination, the ADA and Title VII claims are time-barred and will be dismissed.

### ii. Title VII Retaliation Claim Fails as a Matter of Law

"Proof of a retaliation claim under Title VII is governed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). Under the *McDonnell Douglas* paradigm, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of retaliation. 411 U.S. at 802. A prima facie case of retaliation requires a showing by a preponderance: "(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Wrenn*, 808 F.2d 500 (citations omitted). This initial burden is "easily met." *Id.* (citations omitted).

Afterward, the burden shifts to the employer to articulate "some legitimate, nondiscriminatory reason" for the alleged retaliatory action. *McDonnell Douglas*, 411 U.S. at 802. Once the defendant does so, the presumption arising from the prima facie case "automatically drops out of the case." *Wren*, 808 F.2d at 501 (citation omitted). "Defendant need not persuade the court it was actually so motivated, but need merely raise a genuine issue of fact as to whether it in fact intentionally discriminated against the plaintiff." *Id.* (citations omitted). The plaintiff must then "be afforded a fair opportunity to show [by a preponderance] that [the employer's] stated reason for [the retaliatory action] was in fact pretext." *McDonnell Douglas*,

411 U.S. at 804. Despite the burden-shifting framework, "the ultimate burden of proving that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times." *Wren*, 808 F.2d at 500 (citations omitted).

Even assuming *arguendo* that Layman was able to present a prima facie case, UPS has come forward with a legitimate, nondiscriminatory reason for its action that Layman has not rebutted. Layman was the *only employee in the world* who refused to complete the 2016 Questionnaire. DN 18-6 at 27. All other eligible employees (totaling 46,807 worldwide) participated. *Id.* UPS has fired multiple employees for insubordination after refusing to complete the Questionnaire. DN 28-6 at 3, 28. The Sixth Circuit has "repeatedly held that insubordination may constitute a legitimate, nondiscriminatory reason for adverse action." *Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013) (collecting cases). Layman offers nothing to demonstrate that such a decision would be pretextual. Therefore, summary judgment is proper on this ground.

### iii. Negligence and Conspiracy Claims are Time-Barred by Kentucky's Statute of Limitations

It is clear in Kentucky that "a statute of limitations which specifically mentions a recognized tort applies to all actions founded on that tort regardless of the method by which it is claimed the tort has been committed." *Branham v. Micro Comput. Analysts*, 350 F. App'x 35, 37 (6th Cir. 2009) (citations omitted). Relatedly, "a specific statute of limitations covers all actions whose real purpose is to recover for the injury addressed by it in preference to the general statute of limitations." *Id.* In other words, where a plaintiff "attempt[s] to recover for the same injury under the guise of several different actions," the Court should apply the statute of limitations related to the "basis and driving force" of the complaint. *Madison Capital Co., LLC v. S & S Salvage, LLC*, 794 F. Supp. 2d 735, 742 (W.D. Ky. 2011).

Here, Layman's common law claims are for negligent hiring, retention, and supervision, intrusion upon seclusion, public disclosure of private facts, false light, conspiracy, and intentional infliction of emotional distress. The thrust of his state law claims is that UPS and its employees obtained and disclosed information relating to Layman's sexual orientation and disability status. To the Court, the most applicable of the torts listed are the privacy torts. Therefore, to the extent Kentucky's statutes are not explicit in covering claims, the Court will adopt the statute of limitations applied to invasion of privacy actions.

As an initial matter, both conspiracy and negligence are explicitly enumerated as having a one-year statute of limitations. *See* KY. REV. STAT. § 413.140(1)(a) (negligence); *Id.* at § 413.140(1)(c) (conspiracy). *See also Barnes v. Stratton*, No. 3:16-CV-214-DJH, 2017 WL 903468, at *7 (W.D. Ky. March 7, 2017) (a claim for negligent hiring and supervision . . . [is] subject to the one-year statute of limitations for personal injury provided by KY. REV. STAT. § 413.140(1)(a)). Those claims arose sometime in 2014 or 2015 and were included in Layman's 2016 EEOC Charge but were not brought in court until December 2017. Therefore, those claims are time-barred.[6]

The Court must then determine what statute of limitations applies to privacy torts in Kentucky and apply that to the claims for intrusion upon seclusion, public disclosure of private facts, false light, and intentional infliction of emotional distress. Kentucky's statutes do not explicitly apply a statute of limitations to privacy torts. The closest appears to be a one-year statute of limitations for defamation actions. KY. REV. STAT. § 413.140(1)(d). Where invasion of

---

[6] The "continuing violations" doctrine is not applicable in this case. In applying that doctrine, the Court must look to the event that "should have alerted the average lay person to protect his rights." *Conlin v. Blanchard*, 890 F.2d 811, 815 (6th Cir. 1989) (citation omitted). When a plaintiff has filed multiple Charges of discrimination with the EEOC, the earlier Charges indicate knowledge sufficient to prevent tolling of the statute of limitations. *Id.* Here, Layman was aware of the alleged spying before the filing of the first EEOC Charge. As a result, the alleged torts arose from discrete acts that occurred outside the limitations period.

privacy claims spring from a defamation claim, the one-year statute of limitations for those latter actions applies. *Branham*, 350 F. App'x at 37. However, it is not clear the same is true where there is no defamation claim to link the invasion of privacy claims with the statute. *Stanley v. Our Lady of Bellefonte Hosp., Inc.*, No. 11-110-DLB, 2012 WL 4329265, at *12 (E.D. Ky. Sept. 20, 2012) (stating in *dicta* that "it is more likely that a stand-alone false light claim is subject to the five-year statute of limitations").

The Court finds the *Stanley dicta* persuasive. The rule in Kentucky is that "a statute of limitations which specifically mentions a recognized tort applies to all actions founded on that tort regardless of the method by which it is claimed the tort has been committed." *Branham*, 350 F. App'x at 37. The rule is *not* that actions are covered by statutes of limitation that are merely similar. Most cases applying Kentucky's one-year statute of limitations to the invasion of privacy torts do so because "they sprang from the same conduct underlying the plaintiffs' defamation claims." *Stanley*, 2012 WL 4329265, at *12 (collecting cases). Where there is no defamation claim, similar torts like invasion of privacy should not be governed by that statute of limitations. Therefore, Kentucky's five-year catchall statute of limitations should apply to the remaining claims. KY. REV. STAT. § 413.120(7).

### iv. Privacy Claims Fail as a Matter of Law

On the merits, Layman's privacy claims fail for a number of reasons. As an initial matter, in Kentucky "the right of privacy does not extend to statements that are made orally." *Dukes v. Mid-Eastern Athletic Conference*, 213 F. Supp. 3d 878, 884 (W.D. Ky. 2016) (citing *Brents v. Morgan*, 299 S.W. 967, 970 (Ky. Ct. App. 1927)). "Thus, to the extent that [a plaintiff's] claim for invasion of privacy is based on oral statements, judgment [as a matter of law] is appropriate." *Id.* The statements must also be publicized. "[P]ublicity means the information was passed along

13

in a way substantially certain to become general knowledge either through dissemination to the public at large or to a multitude of persons." *Ghassomians v. Ashland Ind. Sch. Dist.*, 55 F. Supp. 2d 675, 693 (E.D. Ky. 1998). "Consequently, a communication to a single person or small group of persons does not constitute publicity while publication to a crowd or through the mass media does." *Id.*

Here, Layman's claim revolves around only oral dissemination of information to a relatively small number of people—his coworkers at UPS. Layman is able to provide nothing more than conclusory statements regarding the alleged privacy invasions and he, though permitted by the Court, did not retain a forensics expert to develop his allegations of cybercrime. *See* DN 10 (extending expert disclosure deadlines). Mere allegations of verbal gossip to a limited number of people is insufficient to support invasion of privacy torts in Kentucky. Therefore, UPS is entitled to summary judgment on this issue.

### v. Intentional Infliction of Emotional Distress Claim Fails as a Matter of Law

Intentional infliction of emotional distress, also called outrage in Kentucky, requires a plaintiff to demonstrate that 1) the tortfeasor's conduct was intentional or reckless; 2) the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3) there is a causal connection between the tortfeasor's conduct and the emotional distress; and 4) the emotional distress is severe. *Humana of Ky. v. Seitz*, 796 S.W.2d 1, 2–3 (Ky. 1990) (citing *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984)). UPS focuses its attack on the second prong, arguing that the termination of an employment relationship in a discrimination case is not sufficiently outrageous and intolerable so as to offend generally accepted standards of decency and morality.

The Restatement provides an in-depth description of the standard:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. L. INST. 1965). *See also Craft*, 671 S.W.2d at 249 (explicitly adopting § 46 of the Restatement as the law of Kentucky).

Kentucky courts have been particularly reticent to find outrage arising from factually similar employment disputes, going as far as holding that "[t]ermination from employment, even if for discriminatory reasons, is insufficient to constitute outrageous conduct sufficient to support a claim for intentional infliction of emotional distress." *Highlands Hosp. Corp. v. Preece*, 323 S.W.3d 357, 368 (Ky. Ct. App. 2010). Similarly, mere gossip at the office is insufficient to satisfy the outrage prong, even assuming *arguendo* that UPS could be liable for its employee's conduct. *See e.g. Pierce v. Comm. Life Ins. Co.*, 40 F.3d 796, 806 (employer statements that employee "might as well have been a murderer, rapist, or child molester" were insufficient to support outrage action).

Layman has failed to demonstrate conduct that rises to the level or outrageous conduct. At worst, he was subjected to office gossip amounting to nothing more than "mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities."[7] As a result, summary judgment is proper on this ground.

## IV. Conclusion

Every litigant is entitled to their day in Court. Layman has been dilatory in participating in his case—and consistently unable to show good cause for that delay—to the detriment of UPS. Finally giving UPS the opportunity for its arguments to be heard, the Court is convinced that Layman has been unable to provide sufficient evidence that he would be able to prove his case at trial. As a result, the Court will grant summary judgment to UPS on all claims in the complaint and dismiss this case.

A separate order will be entered in accordance with this opinion.

May 1, 2019

**Charles R. Simpson III, Senior Judge**
**United States District Court**

---

[7] While being recorded in one's own home might rise to the level of outrageous, Layman has admitted that UPS did not undertake such action. *See* DN 28-4 at 3 (Layman's statement that a previous employer had undertaken surveillance of him). No action attributable to UPS meets the standard of outrageous conduct required.